**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

_____

DANIEL J. KROCK,                                    :
                              Plaintiff,            :          No. 5:14-cv-3683
                     v.                             :
                                                    :
THE UNITED STATES OF AMERICA,                       :
                              Defendant.            :
_____

<u>**MEMORANDUM OPINION**</u>

**Joseph F. Leeson, Jr.**                                                **January 5, 2016**
**United States District Judge**

A.      <u>**INTRODUCTION**</u>

         This is a medical malpractice action arising under the Federal Tort Claims Act, 28 U.S.C.

§§ 2671-2680.  Plaintiff Daniel Krock, a Veteran, alleges that he received negligent medical

treatment at the United States of America's Veteran's Administration Clinic ("VA") located in

Allentown, Pennsylvania beginning on June 19, 2012.  Plaintiff alleges that as a direct and

proximate result of the failure to diagnose congestive heart failure he suffered permanent heart

damage for which his only remedy is a heart transplant.

         This Court held an evidentiary hearing on July 22, 2015, on Defendant's Motion to

Preclude Plaintiff's Expert, Dr. Devandra K. Amin, from Testifying as an expert witness

regarding the standard of care and causation.  Mot., ECF No. 19.  The Motion was denied as to

Dr. Amin's testimony regarding Dr. Whitson.  Op., ECF No. 32.

         A bench trial began on August 17, 2015, with testimony being concluded on August 20,

2015.  The parties subsequently filed proposed findings of fact and conclusions of law, ECF Nos.

47, 52, and, on December 7, 2015, presented oral argument.  The following findings of fact and

conclusions of law are based upon the evidence presented at trial, the parties' submissions, and the arguments advanced by counsel.

**B.**     **FINDINGS OF FACT**

1.        Plaintiff was born on October 10, 1959.  Pl.'s Dep. 7:5-6, Jan. 23, 2015, Pl.'s Ex. G.[1]

2.        The earliest medical records available to the court prior to Plaintiff's treatment at the VA in February 2011, begin in January 2008, when Plaintiff began treating at George M. Joseph, M.D. & Associates.  Manja Medical Records, Def.'s Ex. 29.

3.        On January 22, 2008, Plaintiff first presented to Dr. George Manja, who has a specialty in internal medicine, with no complaints of pain or shortness of breath. Manja Dep.[2]

4.        Plaintiff reported that he had lost a lot of weight, but was still noted to be obese at 221 pounds.  Manja Medical Rs. at 36.

5.        Plaintiff's blood pressure was high at 160/95, Manja Medical Rs. at 36, which concerned Dr. Manja, Manja Dep.

6.        The only medication Plaintiff was taking at the time was Viagra.  Manja Dep.

7.        Dr. Manja renewed the Viagra prescription, prescribed Avapro for Plaintiff's high blood pressure, and ordered blood and urine tests.  Manja Medical Rs. at 28-36; Manja Dep.

8.        Laboratory results from January 23, 2008, showed that Plaintiff's cholesterol, triglycerides, and glucose were extremely high.  Manja Medical Rs. at 28-33.

---

[1] Plaintiff's videotaped deposition was played in court on August 17, 2015, and the transcript therefrom was admitted as Plaintiff's Exhibit G.

[2] The videotaped deposition of Dr. Manja was played in court on August 19, 2015, but was not transcribed for the official record.  Although Defendant cites to a transcribed deposition in its proposed findings of fact and conclusions of law, the transcript is not part of the record. Accordingly, where there is no related Exhibit to cite, this Court will cite only generally to Dr. Manja's deposition testimony.

9.      Plaintiff's blood test results showed micro albuminuria, which revealed that glucose, which measured 290 mg/dL, was spilling into his kidneys.  Manja Medical Rs. at 32; Manja Dep.

10.      Once a person's blood sugar gets above 170 mg/dL, sugar starts to spill into the urine.  Kaufman, Trial Tr. vol. 4, 42:8-9, Aug. 20, 2015, ECF No. 51.

11.      Plaintiff's urinanaylsis confirmed that he was secreting glucose.  Manja Medical Rs. at 33; Manja Dep.

12.      Plaintiff's high micro albuminuria and creatinine levels are a sign of diabetes affecting the kidneys, which is indicative of diabetic neuropathy.  Trial Tr. vol. 4, 32:5-25, ECF No. 51.

13.      Diabetic neuropathy is a malfunctioning of peripheral nerves that is due to damage in the tiny blood vessels that feed the nerves, such that the peripheral nerves begin to starve.  Id. at 33:1-4.

14.      Micro albuminuria is a cause of diabetes and vascular diseases.  Manja Dep.

15.      Dr. James Burke, an expert in cardiology, testified that Plaintiff's high micro albuminuria level was evidence of damage to Plaintiff's kidneys.  Id. at 281:23 - 282:6.

16.      Dr. Burke opined that because there was damage to Plaintiff's kidneys, he would have to assume there was also damage to other organs, such as his heart.  Id.

17.      Dr. Burke explained that as kidneys become damaged, the patient can have progressive hypertension which can contribute to congestive heart failure.  Id.

18.      Plaintiff's A1C results from blood collected on January 23, 2008, reflect that his blood sugar and diabetes were "grossly out of control."  Trial Tr. vol. 4, 30:17-20.

3

19.     Hemoglobin A1C, which measures blood sugar over a three-month period, "is essentially the definition of controlled versus uncontrolled diabetes."  Trial Tr. vol. 4, 29:8-15; Manja Medical Rs. at 29, 37; Manja Dep.

20.     Plaintiff's A1C showed that he had "uncontrolled diabetes."  Manja Medical Rs. at 29, 37; Manja Dep.

21.     When A1C is high for prolonged periods, "the damage continues to be done." Trial Tr. vol. 4, 276:18 - 277:2.

22.     Based on Plaintiff's laboratory results, Dr. Manja changed the Avapro prescription to Lisinopril/HCTZ, prescribed Janumet/Metformin for diabetes, and Vytorin (Simvastatin and Ezetimibe) for hyperlipodymia.  Manja Medical Rs. at 11, 13.

23.     Plaintiff was directed to have follow-up blood work in approximately four to six weeks, but did not have blood drawn again for approximately two years.  Manja Medical Rs. at 26-7; Manja Dep.

24.     At an appointment on March 6, 2008, Plaintiff informed Dr. Manja that he had not taken his prescribed medication because it was too expensive.  Manja Medical Rs. at 17; Manja Dep.  Plaintiff also complained of a rash on his foot.  Id.

25.     Plaintiff's blood pressure was high at 161/90 and Dr. Manja testified that Plaintiff needed to be treated to prevent future cardiovascular complications.  Manja Medical Rs. at 17; Manja Dep.

26.     Dr. Manja prescribed Lisinopril/HCTZ for hypertension, Janumet for diabetes, Zocor for hyperlipidemia, and Clotrimazole Betamethasone Cream (Lotrisone) for his foot rash. Manja Medical Rs. at 17; Manja Dep.

27.     Another doctor at George M. Joseph, M.D. & Associates treated Plaintiff on October 6, 2008.  Manja Medical Rs. at 16; Manja Dep.

28.     Plaintiff reported that he had again stopped taking his medications.  Id.

29.     Plaintiff's blood pressure was high at 160/90, for which Lisinopril was prescribed. Id.

30.     Plaintiff was prescribed Metformin and Amaryl for diabetes.  Id.

31.     Plaintiff was provided a laboratory sheet for blood work, but never had blood work completed.  Manja Medical Rs. at 15; Manja Dep.

32.     Dr. Manja next treated Plaintiff on December 23, 2009, at which time Plaintiff reported not taking the prescribed Lisinopril or Amaryl.  Manja Medical Rs. at 11; Manja Dep.

33.     Plaintiff did not complain of any chest pain or shortness of breath, but his blood pressure was high at 160/100.  Id.

34.     Dr. Manja ordered blood work, which was collected on January 8, 2010.  Manja Medical Rs. at 5-9; Manja Dep.

35.     Results from Plaintiff's blood work showed high glucose, signifying uncontrolled diabetes, high cholesterol, and high triglycerides.  Manja Medical Rs. at 6-9; Manja Dep.

36.     Dr. Manja started Plaintiff on Glucovance to treat his high blood pressure and advised Plaintiff to keep his previously scheduled appointment on January 18, 2010.  Manja Medical Rs. at 5; Manja Dep.

37.     Dr. Manja he never saw Plaintiff again.  Manja Dep.

38.     Throughout his time of treatment at George M. Joseph, M.D. & Associates, Plaintiff was never able to control his diabetes, his high blood pressure, his high cholesterol, and/or his obesity.  Manja Dep.; Trial Tr. vol. 2, 132:3-14, Aug. 18, 2015, ECF No. 49.

39.    Dr. Kaufman, an expert in internal medicine and primary care, opined that his overall impression is that while Plaintiff was treating at George M. Joseph, M.D. & Associates, Plaintiff's weight, hypertension, and diabetes were all grossly out of control, and Plaintiff had poor medication compliance.  Trial Tr. vol. 4, 45:25 - 47:8.

40.    Dr. Kaufman further testified that there were no signs of congestive heart failure in Plaintiff's medical records from George M. Joseph, M.D. & Associates.  Id.

41.    However, being asymptomatic in terms of congestive heart failure does not mean that Plaintiff's heart was not being affected by the underlying disease processes.  Trial Tr. vol. 4, 286:20-23.

42.    The symptoms of heart failure include shortness of breath, edema, an inability to sleep at night, severe lack of energy, dyspnea upon exertion, chest pain, fatigue, malaise, palpitations, dizziness, fainting, and depression.  Trial Tr. vol. 2, 123:16-25 - 124:1-5.

43.    Symptoms of heart failure are different than risk factors for heart failure.  Trial Tr. vol. 2, 124:6-8.

44.    The risk factors for heart failure include high blood pressure, high cholesterol, tobacco use, obesity, diabetes, and to a lesser extent physical inactivity.  Trial Tr. vol. 2, 124:9-23.

45.    Plaintiff was first seen at the VA on February 17, 2011, at an ER visit, for treatment of diabetes mellitus, hypertension, and two open wounds on his right foot.  Progress Notes, 396, Feb. 17, 2011, Def.'s Ex. 14; Amin Report, Pl.'s Ex. K.

46.    Plaintiff advised the VA that he was being treated by a private doctor, who issued medications for his diabetes and hypertension, but that he wanted to be assimilated into the VA system to receive his medications.  Progress Notes 396, Feb. 17, 2011.

47.     Plaintiff was not in fact seeing a private doctor, as his last treatment was more than a year prior with Dr. Manja.  Manja Medical Rs.

48.     Plaintiff's blood pressure was 151/94.  Progress Notes 396, Feb. 17, 2011.

49.     Plaintiff did not have any chest pains, shortness of breath, or any complaints related to congestive heart failure.  Id.; Trial Tr. vol. 4, 286:24 - 287:2.

50.     Laboratory results revealed that Plaintiff's kidney function was stable and his sugar was 134.  Progress Notes 397, Feb. 17, 2011.

51.     Plaintiff's prescription for Lisinopril/HCTZ was refilled, and he was prescribed Keflex to treat his leg wound.  Id.

52.     The VA's Staff Physician did not refill Plaintiff's prescription for Glimepiride, but referred Plaintiff to a primary care physician in that regard.  Id.

53.     On March 11, 2011, Plaintiff underwent Eye Teleimaging at the VA, which noted Plaintiff's need for further treatment for diabetic changes, and an appointment was scheduled with Dr. Whitson, a primary care physician.  Progress Notes 393-95, Mar. 11, 2011.

54.     Dr. David Whitson, Plaintiff's primary care physician at the VA, first treated him on March 14, 2011.  Progress Notes 383-93, Mar. 14, 2011.

55.      Dr. Whitson suspected that the changes in Plaintiff's vision were related to changing sugars.  Id. at 385.

56.     Dr. Whitson noted in his report that Plaintiff had been on medications outside the VA, but had not been monitoring his sugar and essentially had been under no treatment for the previous two years.  Id. at 384.

57.     Plaintiff's blood pressure was 136/74, he weighed 229 pounds, and he had no chest pain, shortness of breath, or dyspnea on exertion.  Id.

7

58.     Laboratory results revealed normal kidney and liver function, and a sugar level of 139. Id.

59.     Nurse Amy Shock completed a diabetic foot screen on Plaintiff's feet, but did not observe any edema.  Trial Tr. vol. 1, 112:10 - 111:4, Aug. 17, 2015, ECF No. 48.

60.     Dr. Whitson prescribed medications for Plaintiff's hypertension and diabetes, specifically Lisinopril/HCTZ, Glipizide, and Metformin, provided diabetic equipment to allow Plaintiff to monitor his sugars, ordered an A1C, and set up consults for foot care and in the Diabetic Clinic.  Id. at 86.

61.     After receiving the results of Plaintiff's A1C later that day, Dr. Whitson called Plaintiff to report that the level of 12.7 was "terrible" and expressed the need to get it down. Progress Notes 383, Mar. 14, 2011; Trial Tr. vol. 1, 114:7-25.

62.     In Dr. Amin's expert report, he opined that it was a violation of the standard of care not to order an exercise test in light of Plaintiff's uncontrolled diabetes, obesity, and non-compliance with medications.  Amin's Report; Trial Tr. vol. 2, 7:13 - 25:14; Mem., ECF No. 32.

63.     Regardless, Dr. Amin testified at trial that pursuant to the Journal of American College of Cardiology Practice Guidelines for 2010, conducting a stress test was not required by the standard of care and it was not a violation of the standard of care that Dr. Whitson failed to order such test.  Trial Tr. vol. 2, 139:20 - 140:8.

64.     Dr. Amin also opined that a cardiac work-up should have been completed on Plaintiff within a year, but that there was no immediate need.  Id. at 31:8-15.

65.     Dr. Kaufman, however, opined that Dr. Whitson exceeded the standard of care in treating Plaintiff on March 14, 2011.  Trial Tr. vol. 4, 15:19-21, 23:20-24, 57:4-8.

66.     Plaintiff received additional treatment at the VA by Dr. Whitson, Podiatry, and/or the nursing staff between March 14, 2011 and June 2012, but there is no evidence that any such treatment violated the standards of care prior to June 26, 2012.  Progress Notes 314-383; Amin's Report.

67.     On May 18, 2011, Plaintiff cancelled his diabetic nurse clinic appointment for that day.  Progress Notes 360, May 18, 2011.

68.     On November 9, 2011, Dr. Whitson reported that Plaintiff's sugar was high at 400, and noted that Plaintiff should be notified "to be in contact with his primary care provider outside of the VA for regulation of [his diabetes] medications."  Progress Notes 317, Nov. 9, 2011.

69.     Plaintiff was sent an open access reminder letter in January 2012, advising him to schedule a return appointment to see Dr. Whitson in February, 2012.  Shock, Trial Tr. vol. 1, 120:1-13; Progress Notes 315, Jan. 12, 2012.  Plaintiff did not respond.  Id.

70.     In April 2012, Plaintiff was sent an open access reminder letter advising him that he was supposed to return in April 2012, for a yearly meter check clinic.  Trial Tr. vol. 1, 120:1-13; Progress Notes 315, Jan. 12, 2012.  Plaintiff did not respond.  Id.

71.     Records from CVS Pharmacy show that Plaintiff filled prescriptions for Lisinopril/HCTZ and Simvastatin, each in a thirty-day supply, on March 6, 2008, along with a seven-day supply of Ambien, a sleeping pill.  CVS Patient Prescription Record at 3, Def.'s Ex. 31.  Plaintiff filled a prescription for Lotrisone on May 31, 2008.  Id.  Prescriptions for Viagra were filled on June 14, 2008, and February 8, 2009.  Id.

72.     Plaintiff filled his Lisinopril/HCTZ prescription at a Wal-Mart Pharmacy on November 3, 2008, in a thirty-day supply, on January 24, 2009, in a thirty-day supply, on

December 23, 2009, in a thirty-day supply, and on May 12, 2011, in a ninety-day supply.  Wal-Mart Prescription Record at 3, Def.'s Ex. 32.  Plaintiff filled his diabetes medications on November 3, 2008, and January 24, 2009, in a thirty-day supply of Glimepiride, and on March 31, 2010, in a ninety-day supply.  Id.  He filed prescriptions for Metformin on November 3, 2008, in a thirty-day supply, and on March 14, 2011, and July 5, 2011, in a ninety-day supply. Id. at 3-4.  Plaintiff also filled his prescription for Glipizide on March 14, 2011, and July 5, 2011, each in a ninety-day supply.  Id. at 3.

73.     Assuming Plaintiff took all the prescription medication he filled, he nevertheless was completely off any kind of medication for approximately ten months in 2008, ten months in 2009, eight months in 2010, three months in 2011, and five months prior to June of 2012.  See CVS Patient Prescription Record; Wal-Mart Prescription Record; and Calendar, Def.'s Ex. 36.

74.     When Plaintiff filled his medications, he did not always fill all the medications prescribed and was therefore not compliant with his recommended medications for additional periods of time.

75.     Plaintiff's medication compliance between 2008 and June 2012 was poor.  Trial Tr. vol. 4, 47:1-4.

76.     Dr. Burke opined that the gaps in 2008 and 2009 when Plaintiff failed to take the medication prescribed regularly were large enough to affect his heart.  Trial Tr. vol. 4, 282:7-23.

77.     Diabetes, high cholesterol, and high blood pressure are long-term chronic problems that require continuous therapy.  Trial Tr. vol. 4, 276:15-19.

78.     Dr. Burke opined that although taking medication after a long absence cannot reverse its previous damage, it can help prevent progression of the symptoms.  Trial Tr. vol. 4, 301:18-23.

79.     The risk factors for cardiomyopathy include high cholesterol, hypertension, and diabetes.  Trial Tr. vol. 4, 274:12-16.

80.     The way to mediate these risk factors is to control the high cholesterol, hypertension, and diabetes.  Trial Tr. vol. 4, 275:3 - 276:14.

81.     Medication to control cholesterol is risk management, including the risk of atherosclerosis, hardening of the arteries, vascular disease, mostly in the larger arteries, coronary artery disease, and stroke.  Trial Tr. vol. 4, 41:13-21.

82.     High cholesterol contributes to the damage to the arteries that supply the heart muscle, the kidneys, or the brain, creating vascular damage which can weaken the heart muscle.  Trial Tr. vol. 4, 276:3-10.

83.      Medication for hypertension is "risk management plus," intended to control the risk of larger artery atherosclerosis, coronary artery disease, and stroke.  Trial Tr. vol. 4, 41:21-22, 42:1-6.

84.     Hypertension must be managed in order to prevent accumulative damage to the heart and heart muscle.  Trial Tr. vol. 4, 275:24-25 – 276:1-2.

85.     Diabetes is treated to reduce the impact on the smaller blood vessels, to prevent kidney failure, neuropathy, retinopathy, coronary artery disease, and stroke.  Trial Tr. vol. 4, 42:18-24.

86.     Plaintiff's obesity, which he was unable to get under control, was also a risk factor for development of cardiomyopathy or congestive heart failure.  Trial Tr. vol. 4, 299:8-13.

87.     Cardiomyopathy is a progressive disease because as the heart muscle gets weaker the body tries to compensate.  One of the ways the body compensates is by retaining fluid, which puts greater stress on the heart, and a vicious cycle is created.  Trial Tr. vol. 4, 277:7-22.

11

88.     Plaintiff "started" feeling weak and tired in June 2012.  Pl.'s Dep. 8:14-19, Jan. 23, 2015, Pl.'s Ex. G.  He also "started" to experience swelling in his lower extremities and had a difficult time walking up steps.  Id. at 8:19-21.

89.     Although Plaintiff was previously asymptomatic, it does not mean that his heart was not being affected by the underlying disease process.  Trial Tr. vol. 4, 286:20-23.

90.     In Dr. Burke's expert opinion, Plaintiff had irreversible heart disease by the summer of 2012.  Trial Tr. vol. 4, 278:2-6.

91.     Dr. Burke opined that it was not reversible because Plaintiff's ejection fracture rate of 20% happened over a period of time, and that his uncontrolled chronic diabetes and uncontrolled chronic hypertensive heart disease were contributing factors.  Trial Tr. vol. 4, 273:7 - 274:11, 278:8-17, 290:3-9.

92.     The combination of hypertension and diabetes is synergistic in its negative effects, "each one by themselves is bad and together they can contribute to worsening of the processes," in causing damage to the heart.  Trial Tr. vol. 4, 275:17-21.

93.     The Progress Notes from the Wilkes-Barre VA Medical Center's Emergency Room from September 12, 2012, indicate that Plaintiff's renal failure started between November 2011 and July 2012.  Progress Notes 219, Sept. 12, 2012.

94.     On June 5, 2012, the VA returned a phone call to Plaintiff.  Progress Notes 314, June 5, 2012.

95.     Plaintiff requested an appointment to see Dr. Whitson and a refill on his medications.  Id.

96.     Dr. Whitson scheduled an appointment for June 26, 2012, and ordered laboratory tests for Plaintiff to complete in advance.  Progress Notes 314, June 5, 2012.

97.     Dr. Whitson declined to prescribe medications until seeing the results of the laboratory tests.  Id.

98.     Plaintiff's blood test results showed that his glucose was high at 139, his cholesterol and triglycerides were within the reference range, and his A1C was high at 10.2.  Lab Results 226-332, June 14, 2015; Trial Tr. vol. 2, 149:1-2.

99.     Prescriptions for Lisinopril/HCTZ, Metformin, and Glipizide were issued on June 19, 2012.  Medication Profile 34, Def.'s Ex. 24.

100.    Dr. Burke opined that issuing these prescriptions met the standard of care.  Trial Tr. vol. 4, 303:16 - 304:5, 308:2- 9.

101.    At an appointment on June 26, 2012, Plaintiff complained to Dr. Whitson that he was not feeling well, but was unable to determine whether it was because his diabetes was controlled or uncontrolled in light of the fact that while his sugars have been under control recently his A1C is still high.  Progress Notes 297, June 26, 2012.

102.    Plaintiff asked whether his shortness of breath was due to congestive heart failure or a potential heart attack.  Id.

103.    Dr. Whitson noted that it was unclear whether Plaintiff was gaining weight because of fluid or because of weight gain and poor diet control.  Id. at 300.

104.    Dr. Whitson promised to get Plaintiff under control with three months of evaluating his A1C, and to determine whether his coronary arteries were causing him to feel out of breath.  Progress Notes 297, June 26, 2012.

105.    Dr. Whitson noted that there was no edema present and that Plaintiff had not been following his diabetic protocol prior to the previous several weeks.  Id. at 297-299.

106.    The VA returned a call to Plaintiff on July 2, 2012, at which time Plaintiff relayed that he was "still" filling up with fluid, that his feet were "still" swollen, asked for a different water pill prescription, and wanted Dr. Whitson to change the order quantity for his test strips so that he could test his sugar twice a day.  Progress Notes 296, July 2, 2012.

107.    Dr. Amin testified that gaining weight because of fluid is an indication that a patient is developing heart failure or that his kidneys are not working well, which when combined with diabetes and high blood pressure, could cause heart failure.  Trial Tr. vol. 2, 46:7-13.

108.    Dr. Amin stated that in his expert opinion Dr. Whitson's failure to order an echocardiographic study to assess the underlying causes of Plaintiff's shortness of breath and to determine whether he was in heart failure, was a violation of the standard of care.  Trial Tr. vol. 2, 49:3-14, 102:20 - 103:1; Amin's Report.

109.    Dr. Burke opined, however, that Dr. Whitson did not violate the standard of care in not ordering an echo because there were no signs of congestive heart failure and it would not have changed Plaintiff's overall treatment, which was managing the diabetes and hypertension with medication.  Trial Tr. vol. 4, 267:23 - 268:24.

110.    Dr. Burke opined that an echo is a diagnostic tool, not a treatment, and that Plaintiff's Lisinopril prescription was in accordance with AHA guidelines.  Trial Tr. vol. 4, 309:3-21.

111.    Laboratory results from July 5, 2012, showed that Plaintiff's glucose, cholesterol, and triglycerides were within the reference range.  Lab Results 226-332, July 5, 2015.

112.    Dr. Whitson saw Plaintiff again on July 9, 2012, at which time Plaintiff complained that he was still having a hard time adjusting to his medications, was short of breath

14

upon exertion, had gained ten to twelve pounds, had been constipated, and had been retaining fluid.  Progress Notes 289, July 9, 2012.

113.    Dr. Whitson determined that Plaintiff's diabetes was improving, but that his fluid retention was significant.  Id. at 291.

114.    Dr. Whitson prescribed Lasix at 40 mg twice a day for ten days.  Id.

115.    Dr. Whitson noted that he would call Plaintiff in seven to ten days to see if he was improving, would get lab tests if necessary, and would schedule a repeat visit in September, 2012.  Id.

116.    Dr. Amin opined that Dr. Whitson's failure to make an effort to try to diagnose and explain Plaintiff's symptoms by ordering a renal workup, for example, rather than increasing Lasix and restricting Plaintiff's salt intake, was a violation of the standard of care.  Trial Tr. vol. 2, 73:5-10, 258:16-19; Amin's Report.

117.    Dr. Amin explained that ordering Lasix will make the edema better but does not address why Plaintiff's condition is progressively worsening.  Trial Tr. vol. 2, 71:13-19, 73:5-10.

118.    Dr. Burke opined that changing Plaintiff's diuretic to Lasix, which is more potent than HCTZ, was an appropriate plan of treatment.  Trial Tr. vol. 2, 316:17-21, 322:7 – 323:11.

119.    Nurse Marguerite Pinnock also treated Plaintiff on July 9, 2012, and informed him of the importance of drinking eight to ten glasses of water daily.  Progress Notes 295, July 9, 2012.

120.    Dr. Amin opined that this instruction was a violation of the standard of care because Plaintiff was being prescribed a water pill to get rid of the excess fluids he is retaining, which is contrary to advising him to drink more water.  Id. at 73:20 - 75:20.

121.    Dr. Amin was not qualified in the field of nursing, but testified that this instruction violated the standard of care for a physician treating a patient with congestive heart failure.  Id. at 13:7- 75:20; Amin's Report.

122.    Plaintiff saw Dr. Whitson next on July 19, 2012, at which time his blood pressure was stable, but his sugar was elevated, his weight had increased, and his fluid retention was up, and he had 3+ pitting edema with some early lesions.  Progress Notes 281-82, July 19, 2012.

123.    Dr. Whitson concluded that Plaintiff's increased fluid retention "in his feet with an elevated BNP suggest[ed] some increased congestive heart failure."  Id.

124.    Dr. Whitson further noted that he believed the heat was causing Plaintiff to retain more fluid making him more tired and contributing to Plaintiff's allowing his sugar to get out of control.  Id.

125.    Dr. Whitson assessed Plaintiff's condition as chronic venous insufficiency, congestive heart failure, diabetes out of control, obesity out of control, and noncompliance.  Id.

126.    Dr. Whitson increased Plaintiff's Lasix to 80 mg twice a day, placed him on a strict diet, directed him to follow his weight and sugars at home, and advised him to schedule a nursing visit in two weeks to check his edema.  Id. at 284.

127.    Dr. Whitson spoke with Plaintiff on July 30, 2012, at which time Plaintiff complained "bitterly of fatigue."  Progress Notes 272, July 30, 2012.

128.    At an appointment on August 2, 2012, Plaintiff had no chest pain or shortness of breath, his edema was reduced, and at 240 pounds, he had lost twenty-four pounds since July 19, 2012.  Progress Notes 265-71, Aug.  2, 2012.

129.    Dr. Whitson decided to taper Plaintiff off Lasix by reducing his dosage to 40 mg once a day for ten days and then stop completely, hoping to keep the edema out of Plaintiff's legs by maintaining a low salt diet.  Id. at 271.

130.    Dr. Amin opined that while it was reasonable to reduce Plaintiff's Lasix dosage, it was not reasonable to taper him off completely.  Id. at 97:5 - 98:4.

131.    Dr. Amin opined to a reasonable degree of medical certainty that Dr. Whitson's course of treatment between June 26, 2012, and August 2, 2012, was a violation of the standard of care.  Trial Tr. vol. 2, 102:20 - 103:1; Amin's Report.

132.    Dr. Burke and Dr. Kaufman each opined that reducing the Lasix dosage was appropriate.  Trial Tr. vol. 2, 134:10-21, 322:7 - 323:11, 326:11 – 327: 7.

133.    Dr. Burke further opined that with close monitoring, tapering Plaintiff off Lasix completely also was not a violation of the standard of care.  Trial Tr. vol. 2, 322:25 – 323:11.

134.    After August 2, 2012, Plaintiff was treated at the VA by Podiatry, Dentistry, and Optometry, but Dr. Whitson's next Progress Note is dated September 5, 2012.  Progress Notes 251-71, Sept. 5, 2012.

135.    Plaintiff called the VA and left a message on September 5, 2012, which Nurse Shock noted, in which he reported that he was having problems with edema in his feet and legs again, that he was out of Lasix, that he was having constipation problems, and requesting a return call.  Progress Notes 251, Sept. 5, 2012.

136.    Dr. Whitson called Plaintiff the same day and learned that Plaintiff was eating salt-containing food and was swelling up with fluid retention.  Id.

137.    Dr. Whitson prescribed 40 mg Lasix twice a day to address the fluid retention, and directed Plaintiff to take MiraLax to address his bowel issues.  Id.

138.    The next VA Progress Note is dated September 12, 2012, at 9:13 a.m.  Progress Notes 250, Sept. 12, 2012.

139.    Nurse Shock reports that she received a message to call Plaintiff, which she returned.  Id.

140.    Plaintiff reported that he had been taking the Lasix, but had been having painful scrotal edema for the previous five days that made it difficult to walk.  Id.

141.    Plaintiff also complained of being constipated, although he had been taking MiraLax.  Id.

142.    Plaintiff reported that he was only twenty minutes from the Wilkes-Barre VA Medical Center's Emergency Room because he wanted to be evaluated there.  Id.

143.    Nurse Shock contacted the Emergency Room ("ER") to inform them of Plaintiff's expected arrival.  Id.

144.    The Progress Notes from the ER are consistent with Plaintiff's reported symptoms to Nurse Shock.  Progress Notes 235-49, Sept. 12, 2012.

145.    Additionally, Plaintiff complained that he would become short winded with minimal exertion and could not lay flat at night due to shortness of breath.  Id. at 237.

146.    Plaintiff's family history notes that Plaintiff's father died in his late 50's of a myocardial infarction; and his mother has a history of cardiac disease with pacemaker.  Id. at 221.

147.    Plaintiff was given 80 mg Lasix in the ER, along with diuretics and antibiotics.  Id. at 238.

148. By the evening of September 12, 2012, Plaintiff had been admitted with an "Impression" including scrotal edema, venous insufficiency, diabetes, and cardiac enlargement. Id. at 222.

149. Plaintiff's chest x-ray showed cardiac enlargement that was not present in November 2011. Id. at 222.

150. A cardiac cath., which could not be performed sooner based on Plaintiff's elevated BUN and creatinine levels, was planned for September 26, 2012. Id.

151. The Progress Notes indicate that despite significant edema in the lower extremities and an increase in BUN and creatinine beginning in June 2012, Plaintiff was not put on diuretics in June. Id. at 221.

152. On September 13, 2012, Plaintiff weighed 269.9 pounds, as compared to his weight on August 7, 2012, of 240. Progress Notes 174, Sept. 13, 2012.

153. By September 20, 2012, Plaintiff, who was still being treated in-patient, had lost 14.8 pounds, was pain free with reduced edema, but still suffered from exertional dyspnea and fatigue. Id. at 231-32, 238.

154. Dr. Burke opined that Plaintiff had congestive heart failure when he was admitted to the VA Medical Center in Wilkes-Barre in September 2012. Trial Tr. vol. 4, 277:23-25 - 278:1.

## C.   DISCUSSION

### 1.   Applicable Law

This is a claim filed under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680, alleging Medical and Professional Negligence against the United States of America. "The law of Pennsylvania is applicable when a veteran was treated in a hospital in Pennsylvania and alleges

the negligent act occurred in Pennsylvania."  Miterman v. United States, No. 01-5352, 2003 U.S. Dist. LEXIS 12052, at *17 (E.D. Pa. Mar. 6, 2003) (quoting 28 U.S.C. § 1346(b) (providing that claims against the United States under the FTCA are governed "in accordance with the law of the place where the act or omission occurred")).  Under Pennsylvania law, the plaintiff must prove that: (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; (3) the breach was the proximate cause of plaintiff's harm; and (4) the plaintiff suffered damages as a direct result of the harm.  Keating v. Coatesville VA Med. Ctr. (Estate of Keating), 498 Fed. Appx. 181, 184 (3d Cir. 2012) (citing Martin v. Evans, 711 A.2d 458, 461 (Pa. 1998)); Maresca v. Mancall, 135 Fed. Appx. 529, 531 (3d Cir. 2005).  Additionally, the plaintiff must "'present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered.'"  Estate of Keating, 498 Fed. Appx. at 184 (quoting Mitzelfelt v. Kamrin, 584 A.2d 888, 892 (Pa. 1990)).  "Pennsylvania law defines proximate cause as causation which was a substantial factor in bringing about the injury."  Brown v. United States, No. 3:07-0621, 2008 U.S. Dist. LEXIS 52986, at *21 (M.D. Pa. July 7, 2008) (citing Hamil v. Bashline, 392 A.2d 1280, 1284 (Pa. 1978)).  The "plaintiff is required to show that the defendant's negligence was the proximate cause of his injury by a preponderance of the evidence."  Id.

"In some medical malpractice cases that rely on expert testimony, the plaintiff need only provide evidence establishing that the negligent conduct increased her risk of harm."  Tomlin v. United States, No. 14-202, 2015 U.S. Dist. LEXIS 160704, at *9 (E.D. Pa. Nov. 30, 2015). "This lower standard is designed to address 'cases in which, irrespective of the quality of the medical treatment, a certain percentage of patients will suffer harm,' . . . such as failure to timely

diagnose cancer, which results in a reduced likelihood of survival." Id. (quoting Mitzelfelt, 584 A.2d 888). "In these cases, the plaintiff need not provide expert testimony showing that she would have survived had a timely diagnosis been made—only that the delay increased her risk of death." Tomlin, 2015 U.S. Dist. LEXIS 160704, at *9. Under this theory, "a court must determine whether 'a defendant's negligent act or omission increased the risk of harm to a person in plaintiffs [sic] position,' and then 'it becomes a question for the [fact-finder] whether that increased risk was a [factual cause] in producing the harm.'" Balter v. United States, No. 3:09-cv-1409, 2014 U.S. Dist. LEXIS 48594, at *65 (M.D. Pa. Apr. 7, 2014) (quoting Feeney v. Disston Manor Pers. Care Home, Inc., 849 A.2d 590, 595 (Pa. Super. Ct. 2004)). "Where no expert can testify that an action or a failure to act directly caused the result but can testify to a reasonable degree of medical certainty that the action or inaction increased the risk of the bad result occurring, that testimony provides a factual basis from which the jury can answer the substantial factor or factual cause question, namely, did the risk increased by the malpractice actually cause the injury." Pa. SSJI (Civ) 14.20 (Subcommittee Note).

If a plaintiff proves medical malpractice, his recovery may be reduced or eliminated by Pennsylvania's comparative negligence statute, 42 Pa.C.S. § 7102. See Grundowski v. United States, No. 07-2207, 2012 U.S. Dist. LEXIS 68438, at *22-23 (M.D. Pa. May 16, 2012) (entering judgment for defendant after a non-jury trial in an FTCA medical negligence action). The statute provides:

> (a)  General rule. --In all actions brought to recover damages for negligence resulting in death or injury to person or property, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the causal negligence of the defendant or defendants against whom recovery is sought, but any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

42 Pa.C.S. § 7102(a) (2014).  Defendant has "the burden of proving comparative negligence that was the factual cause of Plaintiff's harm."  Flocco v. J.C. Penney Corp., No. 10-2084, 2011 U.S. Dist. LEXIS 98232, at *10-11 (E.D. Pa. Aug. 30, 2011).  See also Balter, 2014 U.S. Dist. LEXIS 48594 at *116 (finding no comparative negligence because the plaintiff bore "no responsibility for the delays which were occasioned by the negligence of [the defendants]").  "Pennsylvania's comparative negligence doctrine reduces the plaintiff's damages in proportion to the amount of negligence for which he is responsible, providing the plaintiff's negligence is not greater than the defendant's causal negligence."  Deitrick v. Karnes, 478 A.2d 835, 840 (Pa. Super. Ct. 1984).  "[W]here the plaintiff is 51% or more causally-negligent, no recovery is permitted."  Id.

 **2.**  **Analysis**

 When Plaintiff first presented to the VA on February 17, 2011, he had no symptoms of heart failure.  Following this visit and Plaintiff's first appointment with Dr. Whitson on March 14, 2011, Plaintiff was issued prescriptions to treat his hypertension and diabetes, provided diabetic equipment to monitor his sugars, ordered to undergo an A1C, and treated for his foot wounds.  Despite the expert testimony of Dr. Amin that it was a violation of the standard of care not to order an exercise test at this time, this Court concludes that Dr. Whitson was not negligent at that point in time.  Significantly, Dr. Amin acknowledged that the Journal of American College of Cardiology Practice Guidelines for 2010, does not require a stress test.  Further, Dr. Kaufman provided his expert opinion that Dr. Whitson exceeded the standard of care in treating Plaintiff on March 14, 2011.

 Plaintiff does not offer expert testimony that any treatment between March 14, 2011, and June 26, 2012, violated the standard of care.  While Dr. Amin opined that Plaintiff should have undergone a cardiac work up after his first appointment with Dr. Whitson on March 14, 2011,

Dr. Amin testified that there was no immediate need and that it only needed to occur within approximately one year.  Plaintiff's failure to respond to open access reminders from the VA beginning in January 2012, prevented Dr. Whitson from treating Plaintiff between November 2011 and June 2012.  Accordingly, any negligence by Dr. Whitson in not ordering a cardiac work up prior to June 2012, is not recoverable because Plaintiff was more than 51% negligent in contributing to any delay.  Further, because Plaintiff did not start experiencing symptoms of heart failure until June 2012, there were no violations in the standard of care by any physician at the VA in failing to test for congestive heart failure prior to June 2012, at the earliest.

Despite being asymptomatic, Plaintiff's heart disease was not reversible by the summer of 2012.  Plaintiff's own failure to control his long-standing diabetes, hypertension, high cholesterol, and obesity were contributing factors to his heart failure and increased his risk of harm.  Each of these factors alone can damage the heart, but together they can contribute to worsening of the damage.  The way to mediate these risk factors is to control them, which may be achieved with medication.  However, despite repeated blood test results between 2008 and 2010, showing that Plaintiff's diabetes and cholesterol were grossly out of control, Plaintiff failed to comply with the treatment plans from George M. Joseph, M.D. & Associates.  Between January 2008 and February 2011, Plaintiff was off his prescribed medications a vast majority of the time, approximately twenty-nine of thirty-seven months.  In Dr. Burke's expert opinion, these gaps were large enough to affect Plaintiff's heart.  After entering the VA system on February 17, 2011, Plaintiff was mostly compliant with his medications for the remainder of the year.  Regardless, Dr. Burke opined that taking medication after a long absence cannot reverse previous damage.  Further, Plaintiff had stopped taking his medications again by February 6, 2012, and did not resume until June 2012, after he started experiencing symptoms of heart

failure.  Therefore, Plaintiff's poor medication compliance and failure to control his diabetes, hypertension, high cholesterol, and obesity were a substantial factor in causing his harm.

By Plaintiff's third appointment with Dr. Whitson on July 19, 2012, the medications Dr. Whitson prescribed were not working and Plaintiff was still experiencing symptoms of congestive heart failure.  Dr. Whitson assessed Plaintiff's condition as chronic venous insufficiency, congestive heart failure, diabetes out of control, obesity out of control, and noncompliance.  Although he increased Lasix, Dr. Whitson failed to take any additional steps, such as ordering an echo, to determine the cause of the edema.  Knowing that the previously prescribed course of treatment was not working, Dr. Whitson violated the standard of care in not attempting to identify the cause and severity of Plaintiff's condition.  Dr. Whitson again violated the standard of care on August 2, 2012, when he decided to reduce Lasix and taper Plaintiff off it completely, again without additional tests into the cause or severity of Plaintiff's condition.  The expert opinion of Dr. Amin supports these conclusions.  Although Dr. Burke and Dr. Kaufman opined that the decision to taper Plaintiff off Lasix completely would not be a violation of the standard of care if Dr. Whitson closely monitored Plaintiff's condition, there is no evidence that Dr. Whitson treated Plaintiff again for more than a month.  By that time, the edema had returned and although Plaintiff was put back on Lasix, he was in the hospital only a few days later with severe and painful edema.  Nevertheless, because Plaintiff's heart disease was not reversible by the summer of 2012, any negligence by the VA in mid to late July and August 2012, was not the factual cause of nor a substantial factor in increasing the risk of Plaintiff's harm.

Based on Plaintiff's history of non-compliance with his prescribed medications, failure to control his diet and monitor his sugars, and non-responsiveness to the VA's open access reminders in 2011, this Court concludes that Plaintiff's negligent behavior increased the risk of

harm.  Further, because Plaintiff's heart disease was not reversible by the summer of 2012, any negligence by Defendant after that date was not a substantial factor in bringing about the harm. Plaintiff is more than 51% responsible for his harm; therefore, no recovery is permitted.

Plaintiff asks this Court to conclude that because Defendant's experts opine there was no negligence on Defendant's part, Defendant failed to meet its burden of proving which portion of Plaintiff's harm is attributable to his past behavior, as opposed to any fault on behalf of the Defendant.  Defendant further contends that Defendant's experts opine only that Plaintiff's past behavior was an increased risk factor, not the cause of his harm.  This Court disagrees.

By asserting that Dr. Whitson was not negligent, Defendant's experts opine that 0% of the fault is attributable to Defendant.  The Second Restatement of Torts provides:

> The rules stated in this Section apply whenever two or more causes have combined to bring about harm to the plaintiff, and each has been a substantial factor in producing the harm, as stated in §§ 431 and 433.

Restatement (Second) of Torts, § 433A (Am. Law Inst. 1965).  See also Martin v. Owens-Corning Fiberglas Corp., 528 A.2d 947, 949 (Pa. 1987) (holding that "[t]he rules in this Commonwealth governing apportionment of damages are consistent with those expressed in the Restatement (Second) of Torts: § 433 A. Apportionment of Harm to Causes.").  Defendant's experts opine that there were not "two or more causes;" rather, Plaintiff's behavior was the sole conduct that increased his risk of harm.  See Tomlin, 2015 U.S. Dist. LEXIS 160704 at *9 (holding that the courts apply a lower proximate cause standard in cases in which certain patients will suffer harm irrespective of the quality of the medical treatment, such as cancer patients).  Without evidence of "two or more causes," apportionment is not applicable.  See Martin v. Owens-Corning Fiberglas Corp., 528 A.2d 947, 949 (Pa. 1987) (holding that § 433A(1)(b) was applicable because there was a "single harm" to the appellant).

Moreover, this Court concludes that even though both Plaintiff and Defendant were negligent, the Defendant's negligence was not the factual cause of nor "a substantial factor in producing the harm."  Restatement (Second) of Torts, § 433A.  As seen here, "[c]ontributory fault may stem from a plaintiff's careless exposure of himself to dangerous conditions or from his failure to exercise reasonable diligence for his own protection."  Ali v. Williams, 2014 Phila. Ct. Com. Pl. LEXIS 296, at *19 (Pa. C.P. 2014).  See also Zieber v. Bogert, 747 A.2d 905, 908 (Pa. Super. Ct. 2000) (holding that it was erroneous not to instruct the jury on comparative negligence due to testimony from the defendant-doctor that he had recommended a C-T scan, which might have allowed the doctor to diagnose cancer sooner, and that the plaintiff had refused to undergo the test).  Plaintiff was required to prove that Defendant's negligence brought about the injury, which he failed to accomplish.

Accordingly, it is unnecessary to make findings of fact and conclusions of law regarding damages.  See Tarnoski v. United States, No. 3:04-0060, 2007 U.S. Dist. LEXIS 33627, at *13 (M.D. Pa. May 8, 2007) (stating that "it is not necessary to make findings of fact and conclusions of law related to the questions of damages" because the negligence of the plaintiff was greater than 50% and any possible negligence on behalf of the defendant, thereby barring recovery under Pennsylvania's comparative negligence law).

**D.**      **CONCLUSIONS OF LAW**

1.      Plaintiff was negligent.

2.      Plaintiff's negligence was a substantial factor in bringing about Plaintiff's harm.

3.      Plaintiff's negligence was a factual cause in bringing about Plaintiff's harm.

4.      Defendant was negligent beginning in July 2012.

26

5.      Defendant's negligence was not a substantial factor in bringing about Plaintiff's

harm.

6.      Defendant's negligence was not a factual cause of harm to Plaintiff.

7.      Defendant did not increase the risk of harm to Plaintiff.

8.      Plaintiff has failed to establish a claim for medical negligence under the FTCA.

9.      Judgment is entered in favor of Defendant and against Plaintiff.


A separate Order will be issued.


BY THE COURT:


/s/ Joseph F. Leeson, Jr._____
JOSEPH F. LEESON, JR.
United States District Judge